IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–02152–EWN

MARY K. LUCERO,

      Plaintiff,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

This is a social security benefits appeal under 42 U.S.C. § 405(g) (2005).  Plaintiff Mary

K. Lucero challenges the final decision of the Commissioner of Social Security (the

"Commissioner"), denying her application for Disability Insurance Benefits and Supplemental

Security Income Benefits.  Jurisdiction is based on 42 U.S.C. § 405(g).

## FACTS

### 1.  *Medical Evidence*

Plaintiff was born on September 28, 1962, and was thirty-seven years old on the date of

her alleged disability onset date.  (Admin. R. at 29, 118) [filed Jan. 7, 2005] [hereinafter "Admin.

R."].)  Plaintiff has a high school education and has worked in the vocationally relevant past as a

nursing assistant, fast food worker, grocery store worker, and housekeeper.  (*Id*. at 24, 133–39,

235.)  Plaintiff alleges that she became unable to work beginning on August 14, 2000 due to

carpal tunnel syndrome, stress, and mood changes.  (*Id*. at  118, 145.)

In July 1995, Plaintiff was in a motor vehicle accident and sustained a mid-shaft fracture of

her right clavicle.  (*Id*. at 201.)  On November 3, 1997, Jan G. Davis, M.D. diagnosed a nonunion

of the fracture and performed surgical plate fixation and bone grafting to the nonunion.  (*Id*. at

198–99.)  On November 6, 1997, Dr. Davis reported that Plaintiff had tolerated the procedure

well and without complications, and released Plaintiff from the hospital.  (*Id*. at  196.)  On

November 13, 1997, Sumant Rawat, M.D. performed a nerve conduction and electromyographic

("EMG") examination on Plaintiff and found mild probable right carpal tunnel syndrome and

possible left carpal tunnel syndrome.  (*Id*. at 195.)

In December 1997, Plaintiff was in another motor vehicle accident, and subsequent X-rays

demonstrated a fracture of one-third of the clavicle fixation plate.  (*Id*. at  203.)  Dr. Davis

diagnosed a persistent nonunion of the clavicular fracture and performed surgical replacement of

the fixation plate and repeat bone grafting.  (*Id*.)  On April 15, 1998, Dr. Davis noted that X-rays

showed the fixation plate was in good position, and Plaintiff's fracture was healed.  (*Id*. at 223.)

On October 28, 1998, Plaintiff presented to Dr. Davis complaining of pain in her right knee and

over her right clavicle.  (*Id*.)  In examining Plaintiff, Dr. Davis found some tenderness overlying

ligaments in Plaintiff's right knee and noted that Plaintiff had a stable joint and a good range of

motion.  (*Id*. at 222.)  Dr. Davis also found that Plaintiff had some tenderness over her clavicle,

but had no pain with motion or manipulation of the right shoulder.  (*Id*.)  Dr. Davis advised

Plaintiff to "take it easy" on her right knee, and to leave the fixation plate in for at least one year

after surgery.  (*Id.*)  Plaintiff did not appear for her scheduled appointments with Dr. Davis on February 24, 1999 and April 14, 1999.  (*Id.*)

On December 7, 1999, a nerve conduction and EMG examination indicated that Plaintiff had mild bilateral carpal tunnel syndrome unchanged from the November 1997 study, and mild progression of the left carpal tunnel syndrome.  (*Id.* at 212.)  On December 15, 1999,  Plaintiff presented to Dr. Davis with disability forms.  (*Id.* at 220.)  Dr. Davis commented, "I have several patients with far worse problems [than Plaintiff's] who are working.  I really do not think this mild carpal tunnel syndrome and history of repaired clavicle fracture should cause [Plaintiff] to have inability to find gainful employment . . . ."  (*Id.*)

On September 13, 2000, Plaintiff presented to Dr. Davis complaining of increasing carpal tunnel syndrome symptoms in the left hand.  (*Id.*)  Dr. Davis reviewed Plaintiff's EMG reports and opined that Plaintiff would not experience good results from surgery because of the mild condition of Plaintiff's carpal tunnel syndrome.  (*Id.*)  Dr. Davis suggested a steroid injection into the carpal tunnel.  (*Id.*)  Plaintiff declined.  (*Id.*)

On October 2, 2000, Dr. Rawat performed a nerve conduction and EMG examination on Plaintiff and found moderately severe right carpal tunnel syndrome consistent with progression and worsening of the mild carpal tunnel syndrome revealed by the November 1997 examination. (*Id.* at 213.)  On December 8, 2000, Dr. Davis indicated on a form to the Colorado Department of Human Services that Plaintiff was scheduled to undergo carpal tunnel surgery and would have no work capacity for three to five months.  (*Id.* at 217–18.)

On January 9, 2001, Dr. Davis performed carpal tunnel release surgery on Plaintiff's right wrist.  (*Id.* at 215.)  On February 1, 2001, Dr. Davis noted that Plaintiff was doing well

postoperatively.  (*Id.* at 214.)  On March 8, 2001, Dr. Davis referred Plaintiff to physical therapy.  (*Id.*)  On August 22, 2001, Dr. Davis noted that Plaintiff requested carpal tunnel release surgery on her left hand.  (*Id.* at 262.)  Plaintiff also requested that Dr. Davis complete paperwork stating Plaintiff was disabled.  (*Id.*)  Dr. Davis noted that recent EMG reports indicated that the carpal tunnel problems on Plaintiff's right side had resolved and the left hand conduction velocities looked good.  (*Id.*)  Dr. Davis did not recommend surgery, and stated, "I am a little hesitant to recommend that she go on [disability]."  (*Id.*)

On November 19, 2001, Plaintiff presented to Lance Farnworth, M.D. complaining of left hand pain.  (*Id.* at 286.)  Dr. Farnworth noted that Plaintiff's left hand had equivocal Phalen's and Tinel's test results.[1]  (*Id.*)  Dr. Farnworth diagnosed possible carpal tunnel syndrome of the left hand and prescribed a thumb splint for Plaintiff's right hand.  (*Id.*)  On December 13, 2001, Dr. Rawat performed a nerve conduction and EMG examination, which indicated mild left carpal tunnel syndrome and post-operative changes with signs of persistent right carpal tunnel syndrome.  (*Id.* at 264.)

On February 27, 2002, Dr. Farnworth performed left carpal tunnel release surgery.  (*Id.* at 265.)  On May 13, 2002, Dr. Farnworth reported that Plaintiff was doing well postoperatively, but had some discomfort over the surgery scar.  (*Id.* at 282.)  Dr. Farnworth released Plaintiff to return to work and activities of daily living without any restrictions.  (*Id.*)

---

[1]Phalen's and Tinel's tests are tests for carpal tunnel syndrome.  In a Phalen's test, carpal tunnel syndrome is confirmed if, after flexing the wrist for one minute, the patient experiences a tingling sensation in the thumb and fingers.  4 Attorneys' Dictionary of Medicine 4621 (Matthew Bender & Co. 2004).  Tinel's test or sign is a tingling sensation at the end of a limb produced by tapping the nerve at the site of injury.  5 Attorneys' Dictionary of Medicine 1444 (Matthew Bender & Co. 2004).

On July 24, 2002, Richard B. Madsen, Ph.D. performed a consultative psychological examination of Plaintiff in connection with her application for social security benefits. (*Id.* at 277–80.) Dr. Madsen concluded that Plaintiff: (1) functioned in the intellectually impaired range; (2) had multiple medical problems, including chronic pain and an intestinal disease aggravated by stress; and (3) appeared significantly depressed. (*Id.* at 280.) Dr. Madsen opined that Plaintiff's depression would affect her energy and motivation and cause difficulties in performing work. (*Id.*)

On July 26, 2002, Plaintiff presented to Dr. Farnworth and reported relief of her familiar pain in her left hand, but complained of thumb pain and cramping, and difficulty gripping items. (*Id.* at 182.) Upon examination, Plaintiff had positive Tinel's and Phalen's tests on the right side, and negative on the left. (*Id.*) Dr. Farnworth found that Plaintiff's left side showed improvement in symptoms, and Plaintiff's right side showed "residual median nerve symptomatology." (*Id.*) Dr. Farnworth provided Plaintiff with an injection in her right hand, and "instructed [Plaintiff] with [sic] aggressive therapeutic exercises for bilateral hands." (*Id.*) On July 30, 2002, Dr. Farnworth indicated that Plaintiff: (1) had bilateral carpal tunnel syndrome; (2) had been or would be disabled for three to five months; and (3) would be capable of working so long as Plaintiff could limit repetitive motion to both wrists and hands. (*Id.* at 288.)

On August 12, 2002, Disability Determination Service ("DDS") physician Ellen Ryan, M.D. reviewed Plaintiff's records and completed a psychiatric review technique form ("PRTF") and a mental residual functional capacity ("MRFC") assessment form. (*Id.* at 228–46.) Dr. Ryan found that Plaintiff had moderate depression resulting in mild restriction of daily activities, moderate difficulties in social function, no episodes of decompensation, and mild difficulties in

maintaining concentration, persistence, or pace. (*Id.* at 236, 243.) Further, Dr. Ryan found that Plaintiff was "not significantly limited" in her understanding and memory; between "not significantly limited" and "moderately limited" in her capacities for sustained concentration and persistence and social interaction, and "not significantly limited in her abilities of adaptation. (*Id.* at 228–29.) Dr. Ryan concluded that Plaintiff could perform non-complex work requiring up to three months to learn, and could accept supervision and relate to co-workers and the public so long as contact was not frequent or prolonged. (*Id.* at 230.)

On September 5, 2002, a DDS physician completed physical residual functional capacity ("RFC") form and opined that Plaintiff could perform work with the following limitations: (1) lifting and carrying up to fifty pounds occasionally and twenty-five pounds frequently; (2) standing or walking for about six hours in an eight-hour day; (3) sitting for about six hours in an eight-hour day; (4) unlimited pushing or pulling; (5) frequent climbing, balancing, stooping, kneeling, crouching, and crawling; and (6) unlimited reaching and gross manipulation and limited fine manipulation of both hands. (*Id.* at 247–53.)

## 2.    *Procedural History*

Plaintiff filed an application for disability insurance benefits and supplemental security income benefits on October 24, 2000.[2] (*Id.* at 289–92.) On June 18, 2001, the social security administration denied Plaintiff's application. (*Id.* at 43.) On July 13, 2001, Plaintiff requested a

---

[2]Plaintiff asserts that she applied for disability and supplemental social security income benefits on September 29, 2000, but the documents Plaintiff references in citing this date reflect a filing date of October 24, 2000. (Pl.'s Br. at 1; *cf.* Admin. R. at 84–86; 289–92.)

hearing before an administrative law judge ("ALJ").[3]  (*Id.* at 51.)  The ALJ originally scheduled a

hearing for October 12, 2001.  (*Id.* at 55.)  On May 21, 2002, the ALJ vacated Plaintiff's request

for hearing and issued an order remanding the case to the DDS for further review, including

consultative psychological and physical examinations.  (*Id.* at 40–41.)  The ALJ scheduled a new

hearing for June 11, 2002.  (*Id.* at 56.)  No further documentation exists in the record regarding

the hearing scheduled for June 11, 2002.

On July 24, 2002, Dr. Madsen examined Plaintiff's mental status and compiled a report, as

requested by DDS.  (*Id.* at 277–80.)  On August 12, 2002, Dr. Ryan examined Plaintiff and

compiled forms as per the ALJ's May 21, 2002 order.  (*Id.* at 228–46.)  On September 6, 2002,

the Social Security Administration agency denied Plaintiff's disability claims.  (*Id.* at 67–71.)  On

October 15, 2002, Plaintiff filed a form requesting a hearing before an ALJ, noting that Plaintiff

had additional evidence to submit.  (*Id.* at 72.)

On July 11, 2003, the ALJ held a hearing, at which Plaintiff and vocational expert Nora

Dunne testified.  (*Id.* at 305–30.)  Plaintiff gave testimony regarding her past work as a nurse's

aid, housekeeper, fast food worker and grocery store worker.  (*Id.* at 175–76.)  Plaintiff testified

that she had pain in her upper extremities due to carpal tunnel syndrome and a metal fixation plate

in her shoulder.  (*Id.* at 309–10.)  Plaintiff testified that she also had back pain and knee pain.  (*Id.*

at 310–11.)  Plaintiff stated that she participated in the state vocational rehabilitation program and

had recently applied for various jobs, including fast food worker, dishwasher, and apartment

---

[3]On July 13, 2001, Plaintiff filed a Request for Reconsideration form, which is not the
correct form to request a hearing before an ALJ.  (Admin. R. at 51.)  On September 7, 2001,
Plaintiff filed the proper form requesting a hearing by an ALJ.  (*Id.* at 48.)  Subsequent documents
in the record refer to the July 13, 2001 request as a request for a hearing by an ALJ, I do the same
to avoid confusion.

cleaner, but had not received a job offer.  (*Id.* at 313.)  Plaintiff testified that she had difficulty

being around crowds, had poor concentration, and did not think she could perform a job requiring

use of a computer.  (*Id.* at 314, 321.)  Plaintiff said that she had trouble riding in a car for long

periods because of pain.  (*Id.* at 318.)  Plaintiff testified that she had difficulty sleeping because of

pain, and napped every day for an hour or two.  (*Id.* at 318–19.)  Plaintiff stated that she could

not sit or stand for more than fifteen to twenty minutes, walk more than three or four blocks, or

lift more than ten or twenty pounds.  (*Id.* at 319, 322, 323.)  Plaintiff said that she did some

housework, including washing dishes, doing laundry, and cooking.  (*Id.* at 316–17.)  Plaintiff

stated that she could work part-time for a period of two to three months.  (*Id.* at 323–24.)

Vocational expert Nora Dunne testified at the hearing regarding her review of the

vocational exhibits in Plaintiff's file.  (*Id.* at 324–30.)  Ms. Dunne testified as to the exertion

requirements and Specific Vocational Preparational ("SVP") levels of Plaintiff's relevant past

work as a nurse's aid, fast food worker, housekeeper, and grocery store worker.  (*Id.* at 325.)

Ms. Dunne testified that all of Plaintiff's past relevant work was either light or medium in exertion

and had SVP levels between two and four.  (*Id.*)  Ms. Dunne testified that an individual similarly

situated to Plaintiff — an individual limited to an exertional level of a full range of light work with

non-exertional limitations of no over chest-level work; no repetitive gripping or grasping with

force; no use of air, torque, or vibrating tools; no constant, assembly-line-type use of the hands or

wrists; no keyboarding; and no dealing with the general public — could not perform Plaintiff's

past work, but could perform light work as a car wash attendant, bakery worker, or photocopy

machine operator.  (*Id.* at 325–26.)  Ms. Dunne testified that an individual subject to the same

limitations outlined above, with the additional limitation of a need to lie down on a daily basis on an unpredictable schedule would not be suitable for competitive employment.  (*Id.* at 326.)

On August 20, 2003, the ALJ issued a decision denying Plaintiff disability benefits and supplemental security income.  (*Id.* at 20–32.)  In reaching his conclusion, the ALJ first found that Plaintiff had not been engaged in substantial gainful employment since August 14, 2000.  (*Id.* at 21.)  Second, the ALJ found that Plaintiff had medically determinable, severe impairments in the form of "carpal tunnel syndrome, affective disorder and problems with her right shoulder."  (*Id.* at 24.)  Third, the ALJ determined that none of these impairments met the medical listings.  (*Id.*)  Fourth, the ALJ made his RFC determination by considering Plaintiff's mental and physical condition and the myriad medical opinions relating thereto, as well as Plaintiff's testimony.  (*Id.* at 26.)  The ALJ found Plaintiff less than fully credible because Plaintiff's "allegation that her impairments, either singly or in combination, produce symptoms and limitations of sufficient severity to prevent all sustained work activity is inconsistent with the medical and other evidence of record."  (*Id.*)   Nevertheless, the ALJ gave deference to Plaintiff's testimony regarding her pain and gave a more restrictive RFC than that contained in the DDS physician's September 5, 2002 opinion, which the ALJ gave little weight.  (*Id.* at 27.)  The ALJ accepted Dr. Ryan's PRTF of Plaintiff as consistent with the record, and afforded it substantial weight. (*Id.* at 25.)  The ALJ discredited Dr. Ryan's MRFC assessment of Plaintiff as inconsistent, and afforded it little weight. (*Id.* at 28.)  The ALJ also afforded Dr. Madsen's July 24, 2002 opinion little weight, because the opinion was based solely on Plaintiff's own statements and was inconsistent with the record as a whole.  (*Id.* at 28.)

The ALJ stated that Plaintiff had the RFC :

> "to perform light work with no repetitive gripping/grasping with force; no over chest level work; no use of air, torque, or vibrating tools; no constant (assembly line type) use of the hands; no dealing with the general public and no keyboarding.  Light work involves lifting of no more than [twenty] pounds at a time, frequently lifting and carrying objects weighing up to [ten] pounds, and may involve a good deal of standing and walking "

(*Id.* at 29.)  Based upon this RFC, the ALJ determined that Plaintiff could not perform any of her past relevant work due to the required exertional levels.  (*Id.*)  The ALJ determined that there are a significant number of jobs in the local and national economy that Plaintiff could successfully perform.  (*Id.* at 30.)  Therefore, the ALJ found that Plaintiff was not disabled.  (*Id.*)

On September 4, 2003, Plaintiff appealed the ALJ's decision.  (*Id.* at 15–16.)  On August 26, 2004, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review.  (*Id.* at 8–11.)  On October 14, 2004, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability and supplemental benefits.  (Compl. [filed Oct. 14, 2004].)  On February 28, 2005, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed Feb. 28, 2005] [hereinafter "Pl.'s Br."].)  This matter is fully briefed.

## ANALYSIS

### 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C.A. § 1383(c)(3) (2005) (incorporating review provisions of 42 U.S.C.A. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing

before the Commissioner of Social Security, because of failure of the claimant or
such individual to submit proof in conformity with any regulation prescribed under
subsection (a) of this section, the court shall review only the question of
conformity with such regulations and the validity of such regulations.

42 U.S.C.A. § 405(g).  Thus, this court's review is limited to determining whether the record as a

whole contains substantial evidence supporting the Commissioner's decision.  *See id.*; *Hamilton v.*

*Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The court must

uphold the Commissioner's decision if it is supported by substantial evidence.  *See Dollar v.*

*Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence nor

substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.

1987).  That does not mean, however, that my review is merely cursory.  To find that the ALJ's

decision is supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey v. Bowen*,

816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is

overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting

it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to

reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th

Cir. 1988); *Frey,* 816 F.2d at 512.

## 2.    *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

-11-

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months." 42 U.S.C.A. § 1382(a)(3)(A) (2004).  In proving his disability, a claimant must

make a *prima facie* showing that she is unable to return to the prior work she has performed.

*Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden,

the Commissioner must show that the claimant can do other work activities and that the national

economy provides a significant number of jobs which the claimant could perform.  *Frey*, 816 F.2d

at 512.

 The Commissioner has established a five-step process to determine whether a claimant

qualifies for disability insurance benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987)

(describing five-step analysis); 20 C.F.R. § 404.1520 (2005).  A claimant may be declared

disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be

disregarded.  *See Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988); 20 C.F.R. §

404.1520(a).  First, the claimant must demonstrate that she is not currently involved in any

substantial gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must show a

medically severe impairment (or combination of impairments) which limits her physical or mental

ability to do basic work activities.  *Id.* § 404.1520(c).  At the third step, if the impairment matches

or is equivalent to established listings, then the claimant is judged conclusively disabled.  20

C.F.R. § 404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis

proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents

her from performing work she has performed in the past.  *See Williams*, 844 F.2d at 751 (citations

omitted).  If the claimant is able to perform his previous work, she is not disabled.  *Id.*; 20 C.F.R.

§ 404.1520(e).  The fifth step requires the Commissioner to demonstrate that (1) the claimant has

the RFC to perform other work based on the claimant's age, education, past work experience, and

(2) there is availability of that type of work in the national economy.  *See Williams*, 844 F.2d at

751; 20 C.F.R. § 404.1520(f).

**3.      Disability Determination**

        Plaintiff sets forth four arguments in support of her contention that the ALJ's decision is

erroneous.  Plaintiff argues that the ALJ: (1) improperly disregarded Dr. Madsen's opinion

regarding Plaintiff's mental impairment; (2) improperly weighed Dr. Ryan's opinions regarding

Plaintiff's mental impairment; (3) improperly determined Plaintiff's MRFC; and (4) improperly

found Plaintiff less than fully credible.  (Pl.'s Br. at 4–5.)  I address each argument in turn.[4]

**a.      Plaintiff's Credibility Evaluation**

        Plaintiff argues that the ALJ erred in finding Plaintiff less than fully credible and in

disregarding Plaintiff's testimony regarding her alleged mental impairments and need to lie down.

"'Credibility is the province of the ALJ.'"  *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir.

1992) (quoting *Brown v. Bowen*, 801 F.2d 361, 362-63 [10th Cir. 1986]).  Credibility

determinations made by an ALJ "should not be upset if supported by substantial evidence."  *White

v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  In assessing credibility, the ALJ may consider

factors including the frequency of medical contacts, extensiveness of attempts to obtain relief,

subjective measures of credibility, and the consistency and compatibility of the medical and

nonmedical evidence.  *Fessler v. Apfel*, 11 F. Supp. 2d 1244, 1251 (D. Colo. 1998).  Further, a

---

        [4]In the interest of clarity and conciseness, I discuss Plaintiff's arguments out of the
sequential order presented and combine Plaintiff's arguments where warranted.

plaintiff's credibility may be questioned because of inconsistencies between the plaintiff's testimony and evidence in the record. *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988). As set forth below, substantial evidence supports the ALJ's determination that Plaintiff's allegations regarding the severity of her impairments were not credible. (Admin. R. at 27.)

The record does not support Plaintiff's claim that she is totally disabled due to the severe limitations of her mental and physical impairments. First, Plaintiff testified herself that she was actively pursuing employment, and felt she could work for two or three months. (*Id.* at 313–14, 315, 323.) Second, Plaintiff testified that she could sweep, do laundry, wash dishes, cook, and fold clothes. (*Id.* at 316–17.) Third, with respect to Plaintiff's mental state, the ALJ noted that Plaintiff did not allege any depression until after her disability claim was initially denied. (*Id.* at 26.) An ALJ may find credibility lacking when a Plaintiff does not seek medical treatment for an alleged ailment. *Fessler*, 11 F. Supp. 2d at 1251. Thus, the ALJ properly considered and noted that Plaintiff did not receive any medical treatment by a mental health provider, and did not assert that she took any medication for depression until July 2002. (Admin. R. at 26.) Further, regarding Plaintiff's sleep issues, Plaintiff stated in a daily activities questionnaire and testified that she takes Ambien, but does not sleep well, and "tosses and turns" all night. (*Id.* at 130, 318.) In contrast, Plaintiff told Dr. Madsen that when she takes Ambien, she sleeps eight hours. (*Id.* at 277.) Evidence in the record, Plaintiff's testimony, and inconsistencies between Plaintiff's testimony and the record suffice as substantial evidence to support the ALJ's credibility determination. The ALJ properly found Plaintiff to be less than fully credible, therefore the ALJ also properly disregarded Plaintiff's testimony regarding her alleged mental impairments and her need to lie down.

### b.      The ALJ's Consideration of the Expert Medical Opinions

Plaintiff argues that the ALJ incorrectly valued the medical opinions of Drs. Ryan and

Madsen.

#### (i)      Dr. Ryan's PRTF and MRFC Opinions

Plaintiff argues that the ALJ erred in evaluating Dr. Ryan's medical opinions in her PRTF

and MRFC determination differently.  (Pl's Br. at 9–11.)  The ALJ found that Dr. Ryan's PRTF

was consistent with the record, and accordingly afforded it substantial weight.  (Admin. R. at 25.)

The ALJ found that Dr. Ryan's MRFC assessment was inconsistent with the record and too

limited, and afforded it little weight.  (*Id.* at 28.)  Plaintiff argues that the ALJ must give the same

weight to both opinions, because the two are consistent.  (Pl.'s Br. at 11.)  Plaintiff's argument is

unconvincing.  Dr. Ryan's PRTF and MRFC opinions relate different information and serve

entirely different purposes.  The PRTF discusses Plaintiff's mental state, while the MRFC

evaluates what Plaintiff would be capable of doing given her mental state.  (Admin. R. 228–30;

233–46.)  In effect, the two opinions are proverbial apples and oranges, and I find no reason that

the opinions must automatically be given the same weight.

In her PRTF assessment, Dr. Ryan found that Plaintiff was moderately depressed and

would have mild restrictions in conducting daily activities and concentrating, and moderate

difficulties in social function.  (*Id.* at 236, 243.)  In her MRFC assessment, Dr. Ryan found that

Plaintiff was "moderately limited" in certain aspects and abilities of social interaction and

sustained concentration, including her abilities to: (1) maintain attention and concentration; (2)

work with others without being distracted by them; (3) interact appropriately with the general

public; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) get

along with peers without distracting them or exhibiting behavioral extremes.  (*Id.* at 228–30.)
The ALJ found that Dr. Ryan's PRTF was consistent with the record, and the MRFC was
inconsistent and too limiting of Plaintiff's abilities.  (*Id.* at 25, 28.)  The ALJ is supported by
substantial evidence.

Specifically, Plaintiff never sought treatment for any mental impairments, Plaintiff never
lost a job because of her condition, and none of Plaintiff's other physicians limited Plaintiff's
activities based on mental abilities or depression at any point.  (*Id.* at 27, 164, 172, 224–26,
262–63.)  Further, as recently as June 2003, Plaintiff applied for numerous jobs that would
involve extended contact with the general public, including restaurant server and "customer
service/sales" positions.  (*Id.* at 175–76.)  This evidence militates in favor of the ALJ's findings
that Plaintiff's mental impairments were slightly limiting.  Accordingly, substantial evidence
supports the ALJ's decision to give the PRTF substantial weight and the MRFC little weight.

### *(ii)*    *Dr. Madsen's Opinion*

Plaintiff argues that the ALJ erred in disregarding Dr. Madsen's opinion.  (Pl.'s Br. at 7.)
Dr. Madsen opined that Plaintiff's significant depression would cause "difficulty maintaining a
regular work schedule or concentrating and focusing on her work."  (Admin. R. at 280.)  The
ALJ afforded little weight to Dr. Madsen's July 24, 2002 opinion, stating that the opinion was
based solely on Plaintiff's own statements, rather than Plaintiff's medical records, and was
inconsistent with the record as a whole.  (*Id.* at 28.)  Plaintiff argues: (1) no evidence in the record
shows that Dr. Madsen failed to review Plaintiff's medical records; (2) the ALJ failed to consider
required factors and gave improper reasons for discrediting Dr. Madsen's opinion; and (3)

because the ALJ rejected Dr. Madsen's opinion, Plaintiff's mental impairment is unassessed and the ALJ's opinion does not comply with remand requirements.  (Pl.'s Br. at 6–9.)

As to whether and what evidence establishes that Dr. Madsen did or did not review Plaintiff's medical records, Plaintiff's argument seems to ask this court to overstep its bounds. (Pl.'s Br. at 7.)  I cannot reweigh the evidence or substitute my judgment for that of the Commissioner.  *Miller v. Chater*, 99 F.3d 972, 978 (10th Cir. 1996); *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991); *Jordan*, 835 F.2d at 1316.  When a physician's opinion is "based heavily on [a plaintiff's] subjective complaints and is at odds with the weight of the objective evidence, including [a plaintiff's] daily activities and physical-therapy [sic] records," an ALJ may properly afford the opinion less deference.  *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999) (citing *Haggard v. Apfel*, 175 F.3d 591, 595 [8th Cir. 1999]).  The ALJ could properly discount Dr. Madsen's opinion, because the ALJ found it was based exclusively on Plaintiff's subjective complaints.  The ALJ also found that Dr. Madsen's opinion was inconsistent with the record and with Plaintiff's abilities and activities.  (Admin. R. at 28.)  As discussed at Analysis § 3b(i) *infra*, substantial evidence supports the ALJ's finding that the record and Plaintiff's activities and abilities were inconsistent with overly-limiting medical opinions.  Therefore, substantial evidence supports the ALJ's decision to discredit Dr. Madsen's opinion for the same reasons.

Plaintiff argues that the ALJ failed to consider required factors and gave improper reasons for discounting Dr. Madsen's opinion.  (*Id.* at 6–7.)  Importantly, as a one-time examining physician, Dr. Madsen is a nontreating source.  "Nontreating source means a physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502 (2005).  "[F]indings of a nontreating physician based upon limited

-17-

contact and examination are of suspect reliability." *Frey*, 816 F.2d at 515; *see also Henderson v. Sullivan*, 930 F.2d 19, 21 (8th Cir. 1991) (noting the court has "consistently discounted the opinions of non-treating physicians who have seen the patient only once, at the request of the Social Security Administration"). In assessing the weight an opinion deserves, an ALJ is required to consider a nontreating source's opinion with regards to several factors, and to provide specific, legitimate reasons for rejecting it. *Siegle v. Barnhart*, 377 F. Supp 2d 932, 940 (D. Colo. 2005) (citing *Doyal v. Barnhart*, 331 F.3d 758, 764 [10th Cir. 2003]) (other citations omitted). The requisite factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (citing 20 C.F.R.§ 404.1527[d][2]–[6]). Here, the ALJ gave specific, proper reasons for discounting Dr. Madsen's opinion. Among the ALJ's reasons were that Dr. Madsen's opinion was unsupported by medical evidence and was inconsistent with the record. (Admin. R. at 28.) Consistency with the record and evidentiary support are proper factors for an ALJ to consider. *Goatcher*, 52 F.3d at 290; *see also Siegle*, 377 F. Supp. 2d. at 940. The ALJ did not err in discounting Dr. Madsen's opinion, because the ALJ found the opinion was based only on Plaintiff's subjective complaints and was inconsistent with Plaintiff's abilities.

Finally, Plaintiff argues that by rejecting Dr. Madsen's opinion, Plaintiff's mental impairment is left unassessed – an impermissible state due to the prior ALJ's remand requesting

consultative reports on Plaintiff's mental impairments. (Pl.'s Br. at 7.) I disagree. First, the ALJ

did not reject the opinion outright, but gave "little" weight to Dr. Madsen's opinion. (Admin. R.

at 28.) Second, the ALJ gave Dr. Ryan's PRTF substantial weight, which would satisfy the prior

ALJ's requirement even if the ALJ had wholly disregarded Dr. Madsen's opinion. (*Id.* at 25.)

### c. *Plaintiff's MRFC Assessment*

Plaintiff argues that the ALJ erred in assessing Plaintiff's MRFC as including the sole

limitation of "no dealing with the general public." (Pl.'s Br. at 11.) As discussed above, the ALJ

gave substantial weight to Dr. Ryan's PRTF opinion that Plaintiff has a "moderate functional

limitation in maintaining social functioning." (Admin. R. at 25.) Plaintiff argues Dr. Ryan's

opinion signals that Plaintiff would be impaired in dealing with supervisors and co-workers in

addition to the general public, and the ALJ's MRFC is thus not supported by Dr. Ryan's opinion.

(Pl.'s Br. at 12.) Plaintiff's argument — which appears to be that supervisors and co-workers are

not part of the general public — is unavailing and unsupported by the evidence.

No evidence in the record suggests that Plaintiff is incapable of performing sustained work

because of her mental limitations, independent of any general public/supervisors and co-workers

distinction. Substantial evidence in the record supports the ALJ's assessment. As set forth

above, the ALJ was not required to accept Dr. Ryan's MRFC opinion that Plaintiff was limited in

her ability to interact with co-workers and supervisors, and the ALJ properly discredited that

opinion. Plaintiff's own actions seeking jobs in customer service and restaurant work lend further

evidentiary support to the ALJ's decision. Accordingly, I conclude the ALJ did not err in

assessing Plaintiff's MRFC.

### 4. *Conclusion*

Based on the foregoing it is therefore

ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 18th day of November, 2005.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge